Would the two lawyers who are going to argue this case please step forward? Good morning. Good afternoon. You're used to it being morning when you're in front of me, yes. Good afternoon. Good afternoon, Justice. You each have 20 minutes. You do not need to feel compelled to use it, but I will ask the appellant if you would like to reserve any part of it. I'd like to reserve five minutes. You can do that. And just remind you to keep your voices up. I've got people in the back, and this does not amplify it, only record it. All right? Thank you. You may proceed. Thank you. Please tell us your names at the start. Yes. You can go ahead and tell us now, and then we'll come out of your time. Go ahead. James Thompson on behalf of the Sergeants' Union. Okay. And John Stimson on behalf of the John Pallohusky Trust, the third-party respondent. All right. Mr. Stimson, whenever you're ready. Thank you. May it please the Court, my name is John Stimson. I represent the Trust in this matter. The Trust, as I mentioned earlier, is a third-party respondent in this case. It is a third-party respondent because a citation to discover assets was issued to the Trust during the course of the collection on a judgment against John Pallohusky. John Pallohusky is the judgment debtor in this case, not a party to this appeal, by the way. That citation that I mentioned was issued to seek assets belonging to the judgment debtor, John Pallohusky, not the Trust assets. The Trust assets, under Illinois law, are exempt from collection from a creditor, sorry, a judgment debtor's creditors under Section 14-2-1403 of the Federal Circulation Act. So it's ultimately right on whether this is or isn't a legitimate trust, a true trust, whether it belongs to a minister. That's right. Okay. Yes, indeed it is. And I would point out that the Trust is laid out over three pages of Mario Tula's will. But the Trust became effective upon the date of her death, correct? That's correct, yes. And he didn't relinquish his position as trustee until five years later, is that correct? That's correct, Your Honor. He was both the beneficiary and the trustee for a period of five years. He was designated as trustee during that period. The property, however, which is the only asset in the Trust, was never conveyed to the Trust during the time that he was trustee. Well, if that's true, then there was no res in the Trust. There's nothing in the Trust. So that's not a valid trust, right? There's got to be something in the Trust, or it's not a trust. The Trust was certainly a valid trust by the terms that were stated in the will. It had not been funded, however. At the point where the property was conveyed to the Trust, it became a valid trust. And by the way, all of this collection effort occurred after that property was conveyed to the Trust. I understand. But, I mean, a trust does require a corpus, right? That's a requirement of a trust. You can't have an empty trust, can you? I don't believe you can. You're saying that the trust wasn't created until the property was conveyed from the estate to the Trust. Is that what your position is? Your Honor, I don't – we are not taking the position that this trust was invalid until the property was conveyed to the Trust. So there was no trust until the property became the corpus of the Trust? Or what? What are you saying? I'm not saying that this trust was invalid. This trust was created and became effective upon the death of Mary O'Toole. Okay. If that's the case, then the Trust needed a corpus at the time of her death. Or assume their death, right? I have not looked at that aspect of this case, Judge. This was not raised by the appellees in their brief as to whether or not this trust was valid. Well, Justice Whitman raises the point that you can't have a trust unless you have a corpus. And the corpus of this trust was only the real estate, right? Correct. Okay. So at what point in time was the Trust created? Upon her death without the property being conveyed? Or after her death when the property was conveyed? That's the question, yes. I understand. And if the statement of law is correct that a trust cannot exist absent an asset, a race, then the answer would have to be that this trust was not created until the property was conveyed to the Trust, if that's an accurate statement of law. I cannot vouch for that myself. But it's your position that even though the Trust says, her will says this property is in the Trust, the property really wasn't in the Trust according to you until five years later. That's your position. The property was not conveyed to the Trustee until five years after Mary died. That's correct. That her will was not sufficient to put that property into the Trust. That's what you're saying. That's correct. Even though her will says this property is in the Trust, it really wasn't. That would be contrary to the probate law in the State of Illinois. What law are you relying on to say that that property is not in the Trust by virtue of her will when she says it's in the Trust and putting it in the Trust? That's what her will says, right? I'm simply saying that the property was not conveyed legally. Legal title to that property was not conveyed to the Trustee as a Trust asset until over five years after she died. I understand that the executor, the new executor, did sign some conveyance five years later. That's right. Five years after she died. That's right. What's your authority for your statement that that was necessary in order to have that property in the Trust? I'm not saying it's necessary. I believe that even had it been conveyed to the Trust upon her death, that would not affect the outcome of this case. The merger document did not operate. John Palahnsky was never party to the Trust. And because of those two things that the Court relied on, which are errors, the Trust, this Court should find in favor of the appellant here. In other words, I'll say it again. Even if the property had been conveyed to the Trust upon her death, the Circuit Court made errors in awarding it to the judgment debtor for collection by his creditors. Why? There's at least three or four reasons, Judge. The first one is that the Court, the Circuit Court, determined that John was a party to the Trust. It said, the Court finds Palahnsky's conduct as a party to the Trust of not showing intention to create a valid Trust. This is an incorrect statement. According to the Court, the carbon rule of testamentary construction to which all other rules must yield is to ascertain the intention of the testator from the rule itself, and to effectuate the intention unless contrary to some established rule of law and public policy. That's the Harris Trust and Servings Basis. You're saying his intent doesn't matter. It's her intent that matters. Yeah, okay. And yet the Court on two occasions in its order stated that John was a party to the Trust and relied on that in saying that as a party, his conduct invalidated the Trust. As I quoted earlier, the Court finds that John Palahnsky's conduct as a party to the Trust did not show intention to create a valid Trust. He wasn't a party. He was not a settler. I read that as being a reference to the delay in his resigning as trustee. No, the conduct that the— I mean, he was a trustee, right? And he did wait five years after her will, after her death, to resign as trustee. That's the only conduct he can really look to, correct? Well, this is part of the point, is that the Court looked at other conduct from the appearance of the order, other than just that act of resignation. And yet there's absolutely no evidence to show that he had anything about John Palahnsky's intentions, nor is it relevant. The only relevant— He was not a trustee at the time of her death. Did he become a trustee of the Trust? He became—he was named as the trustee at the time of her death. That's correct. Okay, so I took it that Judge White was referring to him as a party, meaning he's the trustee of the Trust. Is that an improper conclusion on my part? To the extent that the Court relied on him being a party, and therefore considered his intentions, it is incorrect. He—not only is that those intentions can be considered— I don't have any dispute yet. Fair enough. But my point is, when Judge White referred to him as a party, would a trustee be a party to the Trust? No. Ever? Well, yes, if indeed that trustee was also a settlor or a maker of that trust. Yes, and there are cases where that is the case. How about if he was a beneficiary of the Trust? Not a party to the Trust. There's no case in Illinois that was ever decided based on the intention of the maker of the Trust, where that person was not indeed the testator or the settlor of that trust alone. There are cases where they were both the settlor and the trustee, but never has there been a case decided where the intentions of the— I think we agree with you that it's the settlor's intention that is relevant here, but Judge White did say that O'Toole's clear intention was for Polohofsky to have unfettered dominion and control over the Trust. That's really what he relied on, isn't it? I'm reading at page 7 of his very lengthy opinion. But, I mean, we—I don't think any of us disagree with you that it's the settlor's intention that is relevant here. Well, first of all, let's take a look at that decision. Page 7 of that opinion is a cut and paste from the appellate in this case. The only thing that the court wrote here were the pages following from 19 through 22 of the opinion. In that case, there, what the court actually wrote is this. It does seem as if O'Toole wanted to protect the money of property from outside creditors and so created the Trust that Goldberg drafted in Trust Exhibit 3. However, because of Polohofsky's conduct, the Trust was terminated by merger. That's all the court really says. Everything else that you just asserted— What I'd like to see you do, because I think what you're arguing now is not your strongest argument. I do think that you have an argument, and I think your stronger argument may be that the beneficiaries, that your client was just simply a lifetime beneficiary and that actually he was just trustee on behalf of the children. There's some case law that actually supports that concept. So maybe that's your stronger argument. You're wasting time on this argument. Well, the court applied the merger doctrine here. The merger doctrine says, according to this third-degree statement of trust, that if the legal title to the Trust property and the entire beneficial interest become united, one person of the Trust terminates. The key to that statement, of course, is the entire beneficial interest. Here, as we know, the remainder was meant to go to Mary's heirs who were surviving at the time of John's death. And how would any of those heirs enforce their rights? How would any of those heirs come into court and enforce their rights under this trust? By action against the trustee. But what are their rights? What limits are there? What rights do they have? The trust, which I mentioned earlier, is spread over four pages of the will, has a variety of duties and obligations that the trustee was assigned under the trust. So any of those restrictions, the beneficiaries can enforce any of the duties that the trust. Give me one example of a restriction. I'm a beneficiary. First of all, it's not clear because I still have to be alive after John Polohusky dies. But assuming I can convince the court that I'm likely to be alive after he dies, what is the restriction that I can come in and enforce? Section 9 of the will states that the trustee shall pay the net income of the trust I think the point is that if the trust was a valid trust and that Polohusky was a beneficiary of the trust, right, and the only corpus of the trust was the real estate, if the trustee, who happened to be Polohusky, decided that he needed more money for his maintenance and care, he could expend all the funds in the trust by selling the house and spending all the proceeds of the sale, leaving nothing for anyone after his death. Isn't that possible under the way the trust is written? I don't believe so, Your Honor. And if you can give me just a moment, I'd like to state those limitations. The balance of the net income, if any, shall be accumulated by the trustee, and from time to time added to the principal of the trust. And then what? Could he spend it for his own benefit? He could spend it for the benefit of the beneficiaries. Which is himself. Yes, but it's limited to the health, medical service, physical maintenance, education, reasonable comfort, the best interests of that person. So if indeed, to harken back to Justice Miklas' question, the other beneficiaries, who indeed had to be living, have to be living in order to qualify as heirs under this instrument, could go to court and sue the trustee for acting outside of his or her obligations. In this case, her obligations. But if he's acting within the parameters of those restrictions, he could dissipate the entire corpus of the trust. It's entirely possible that that could happen, correct? For those stated purposes, Judge. Great, okay. I don't want to hold you up on other points. Yeah, I didn't either, but therein lies the problem. Because if he can do that, that creates a problem for the other beneficiaries, if there are other beneficiaries. And the way it's written, it's actually for Mr. Palahowski's, if we were to think of it as for his life, and then I think that it's upon his death, the proceeds are to be distributed per capita. And I don't want to get too much into it, but with per capita, that means you divide at the surviving grandchildren or whatever, that first line of surviving people, if everybody from one generation has passed away, and that would actually violate the rules of these perpetuities. So that can't be the intent of the settler. So there's so many problems, and that's why I thought that was your only argument until I sat and looked at it more closely, and I said, well, that can't even be the argument, because it would violate those perpetuities. I don't want to get too much into it, because then it can become complicated. This case is not about what errors may take. If it's not, then he's the sole beneficiary, and he was the sole trustee, and that's where all the justices have been stating that it creates a problem of merger. Well, he is not the sole beneficiary. He is not the sole remainder man. Mary stated specifically that upon his death, the remainder was to go to her then surviving heirs. Now, there are plenty of cases in Illinois where the heirs are not named, and they are determined by the court, which may be a case that would get litigated, but that's not in front of the court today, and that was not raised by the appellee, nor was the rule against perpetuities, for that matter. So this court, I believe, must determine that there are beneficiaries named who are other than John Powell Husky, and therefore the merger doctrine cannot apply. The merger doctrine obviously was key to the court's decision here, and because the merger doctrine does not apply unless the entire beneficial interest is vested in the trustee, it cannot apply here. If you want to reserve some time for rebuttal, you should probably stop unless there's another point you want to make before that. I would simply like to state, if I haven't already covered it, that the theory of restatement of trust does indeed contemplate the resignation of a trustee in order to avoid merger. So the mere fact that a trustee is indeed named in a trust instrument, the theory of restatement envisions that a trustee being able to avoid any merger issues by resigning. By possibly resigning, I believe is how the restatement comes in. That's correct. Now, and that goes to my earlier point that until there was any property placed in the trust on which Mr. Powell Husky could have acted, that is propped according to the theory of restatement. The mere fact that five years passed doesn't matter. Thank you. May it please the Court, good afternoon. My name is James Thompson, and I'm here on behalf of the Chicago Police Sergeant's Association, Policeman's Benefit, Benevolent and Protective Association, Unit 156A, who is the appellee in this case. Certainly it's the position of the appellee that the doctrine of merger is applicable here, that Mr. Powell Husky at all times had complete and unequivocal control of the only asset in this trust, and by virtue of that. Is it correct that he had already resigned as trustee prior to the property being placed into the trust? I think I heard that question, Justice, and I don't believe that is determinative here. I believe that the trust became effective when it was executed by Mary O'Toole, but no later than when she passed. That was the next day. Ironically, that was the next day, or coincidentally, it was the next day. But, yes, I think that likely at the time she executed it, it was a valid trust, or it was intended to be a valid trust, but no later than at the time that she passed. Then what was the effect if any of the trust, I'm sorry, the executor conveyed the property into the trust? What was the impact of that five years later? What was the significance of that? I don't think that it has any significance with respect to the doctrine of merger. I do think it has an effect with respect to whether or not Mr. Polohusky promptly resigned as trustee. Certainly, in this instance, the executor did in a couple months, which maybe he could have actually done in a few days what the executor, Mr. Polohusky, didn't do over the course of approximately four to five years as an executor. And the only person that would have protested the fact that that property hadn't been transferred to the trust would have been the trustee of the trust, which, again, was John Polohusky. But in looking at this matter as a whole, Justices, it is important to examine the intent of the settler, in this case, Muriel Toole. And Muriel Toole had two equal intentions. One was to protect that asset from the judgment creditor, in this case, my client. And an equal intention was to provide John Polohusky with unlimited dominion and control over that asset. And that's what gives rise to the doctrine of merger. And in the interest of justice and in the interest of public policy, if Mr. Polohusky, in fact, did have complete control and dominion over that property, then that property is then attachable and collectible by the judgment creditor. And if you explore this, the settler's intent, Section 6 for executive powers, Muriel Toole gave John Polohusky the appointment as executor, but she also gave him the broadest powers possible. There was no requirement or exercise of his powers with a court order. He could do it without court order, including the authority to sell the property and no bond. When you look at the powers that she gave John Polohusky as trustee, he had unlimited and unrestricted powers as trustee, including the power to sell the property. And again, the only property in this estate was the house, and the house was not supporting itself. So certainly there was an immediate possibility or probability that that house could be sold. Section 9 of the testamentary document includes that John, as trustee, shall pay to himself any income from the principal of the trust. And if that's not sufficient, paragraph 2 of section 9 provides that John Polohusky can liquidate the corpus of the trust and pay to himself all of the proceeds from the sale to be used in any manner that he determines are in his best interest. So that was her intent, because in paragraph 3 she also says that no interest under this rule shall be subject to claims of his creditors. So she had a dual intention here, and they were equal. Don't let the creditor get it, but you can do whatever you want with it without any type of restraint or restriction. And that is the principle, really, of the doctrine of merger, and that's why we are here. Then what is the impact, going back to Justice Walker's question, of the fact that there are beneficiaries, other beneficiaries named in the trust? Even though they're not named, and I think counsel is correct, is he not, that they don't need to be named by name? They can just be described. That is true. So I relied on In re McCoy, which I felt was very helpful in analyzing these points. One of them was the issue of whether or not Mr. Polohusky, or in the case of McCoy, the trustee who was also the beneficiary, had unlimited control and use of the asset. And in McCoy, the court said the problem is the use of the word required and the use of the word desirable. Well, Webster's Thesaurus states that the synonym for required is necessary and essential, and the synonym for desirable is advisable and expedient, and that's the exact same language we have in this case. So it's my opinion, based upon reviewing those cases, which, and I think this is very helpful, is that, yes, Mr. Polohusky had unfettered control of that asset, which makes it available to the creditors. But to answer that specific point, Justice, in the way McCoy addresses this issue, and it's like Justice Pierce had mentioned, there's no expectation that the contingent beneficiaries were actually going to receive anything because Mr. Polohusky had unfettered control of that asset. And the mere fact that you name a contingent beneficiary doesn't defeat the doctrine of merger if, in fact, Mr. Polohusky, as trustee and as beneficiary, had complete control of that asset. Because while you may have standing as a contingent beneficiary to file an action against a trust, it would be a meaningless action because you would have nothing to argue because the trustee slash beneficiary could use the assets in any way, in any manner he sees fit. So I don't think it's determinative of this issue as to whether or not there is a merger occurred or merger didn't occur, Justice. But there were available methods, and certainly Ms. O'Toole had the availability of a lawyer who was qualified, I guess, in the underlying proceedings as an expert in this area. And some of those methods to cure this problem of merger would be to name a co-trustee, identify another present beneficiary, restrict the powers of the trustee, namely, probably in this case you can't sell, restrict the use of the income or principal by Mr. Polohusky, state or express a duty on the part of the trustee, in this case Mr. Polohusky, to the contingent beneficiaries, or as the restatements indicate, promptly resign as trustee and or beneficiary of the trust. None of those paths to curing this problem ever occurred in this case. Merger occurred and my client should have the ability to levy and sell that asset to recoup the members' contributions to the union. That's our position. Any other questions? Thank you, counsel. Thank you. The appearance of logic breaks down in this case. First, the appellate states that the trustee had unlimited power to sell the property and to use it for his own use. That is not a fair reading of Section 9 of the will. As I pointed out earlier, the will states that the net income of the trust should be accumulated by the trustee and added to the principal of the trust. It can only be used for certain purposes that are articulated in that will. For the health, maintenance, education, and reasonable comfort and best interest that the trustee may determine from time to time. The appellate also states that the property can be sold at any time. It may be that the trustee could sell the property, the house. It also states that that property must be accumulated. Any income from a sale must be accumulated and is subject to the restrictions on the trustee's payment of trust assets to, for example, pay for the health, maintenance, education, and reasonable comfort of the beneficiary. I mean, it's just very broad. And best interest. What is that? Where's the limitation, I guess? That's what we're having trouble with. It's the trustee. It's for the trustee to decide. But the point is that the beneficiaries, in this case the heir, the then surviving heirs of Mary, could take the trustee to task as to whether or not any of these things exist before those proceeds, the trust assets, are paid over to maintain the beneficiary. It may be broad, but it is there. And the beneficiaries, the remaining men here, can enforce that against the trustee. Now, one of the reasons that the appellate's argument fails here from a logical standpoint is because John Powell Husky was not the trustee. While all of this may have made, all of this existed on paper after Mary died, John Powell Husky never acted as trustee during a time where he could have sold the property for his health, maintenance, education, or reasonable comfort. The point that the appellate makes here is that John Powell Husky, and I'll quote it, had unfettered control and dominion over the asset. That is simply not true either as a legal or as a practical matter. He never had any kind of title, either as trustee or otherwise, to this asset. Because you're now relying on the fact that the property was not conveyed to the trust for five years. And he was out, which of course, according to the third recitement, is a way for a trustee to avoid the merger doctrine. And they didn't even do that. But going back to your initial point that we look to the intent of the settler, we look to the intent of the settler, we look at the time that the trust is created, right? I mean, that's what we're looking at. We don't look five years down the road and see what happens. No, that's true. The trust document is absolutely a critical piece of the analysis of determining what the intention of the party was. Now, again, there are restrictions on the trustee. But in addition to that, John Powell Husky was never the trustee, never had control or dominion over any assets of this trust. So as a practical, and in fact, as a legal matter, during the time where the heirs, the remaining heirs. You're saying he never had control over this property. And that basis of that statement is because there was never a conveyance from her estate to a trust. That's your basis, isn't it, right? In part, yes. Well, what's the other? No, that's true. It was not. Okay. What they're saying is that because there was never a conveyance from her estate to a trust, he was never a trustee of anything because there was no trust, because it had no quarters for lack of a conveyance. That's your point, right? Very much so. We indeed never had any control that is being attributed to him under this trust. Then what is the significance of the requirement that we consider the intention of the set law in establishing the trust? Because it was never formally executed by the executor or the probate court or somebody else, her rule was never enforced. It never came into fruition because some living being never wrote out a deed, a quick claim deed to a trust. I mean, her intentions mean nothing. Her intentions mean everything. It may be that the court's measurement of her intentions is different depending on at what point in time you look at her intention, but her intentions are important here today during a time when John Helensky is not the trustee and hasn't been the trustee for several years. Her intention may have been important prior to that time, prior to his resignation. It was certainly important upon her death, and it could be important in the future. It is the single most important thing that the court has to look to. Her intention clearly stated here is that the trustee of her trust had limitations on what that trustee could do with the property, which did not give the trustee unfettered control over that asset. But you're assuming for that argument that he was a trustee, and because he was a trustee and there were contingent beneficiaries, you know, the plaintiff's cause of action is defeated. He either was a trustee because there was a trust, or he was not a trustee because there was not a trust, or she wanted him to be a trustee, but the trust was never created because of a lack of convenience. I mean, you've got to figure out what point you want. This document was intended to create a trust, and it did indeed create a trust. And when the trust was created, who was the trustee? Using Justice Mikva's statement. No, using the settlor's intent. Who was the trustee when the trust was created? Well, she named John Kalahuski as her primary trustee. That's true. That wasn't that hard to say, was it? The point is, Judge, you don't have to look farther than the third restatement of trust to see that some designation of a trustee, which could be a violation or cause the merger doctrine to be imposed, can be reversed or avoided by the resignation of the trustee. And so, during that time, after this trust was written, and after Mary died, and during which John Kalahuski did indeed occupy the nominal role of trustee, he could avoid the application of the merger doctrine by resigning. Agreed. And so, that's what happened. When? In 2015. Five years later. That's correct. So that's prompt in your interpretation. It is indeed prompt, yes. Because there was never any property in that trust that he ever had any control over. And, by the way, if he had, he were delivered by the terms of this trust which were enforceable by the heirs. Thank you, counsel. Thank you. I appreciate your time. Thank you all. You will hear from us shortly. You will hear from us. Thank you. We will take it under advisement. Can you call the next?